# EXHIBIT A

SUMMONS - CIRCUIT COURT  3101-**1** (Rev. 03/2011)

**STATE OF ILLINOIS**  **UNITED STATES OF AMERICA**  **COUNTY OF DU PAGE**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

2017L001260

**First Trust Advisors L.P.**
PLAINTIFF

vs

CASE NUMBER

**Virtu Americas LLC**
DEFENDANT

**SUMMONS**
**CIRCUIT COURT**

File Stamp Here

[X] ORIGINAL  [ ] ALIAS

To each Defendant: **Virtu Americas LLC, c/o RA: Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808**

You are Summoned and Required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance in the office of the Clerk of the Circuit Court, 505 N. County Farm Road, Wheaton, Illinois, within 30 days after service of this summons not counting the day of service.

If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

To the Officer

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than three (3) days before the date of appearance. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than thirty (30) days after its date.

**DATE OF SERVICE**

TO BE INSERTED BY OFFICER ON COPY LEFT WITH DEFENDANT OR OTHER PERSON

**WITNESS:**

Name: **Sara T. Ghadiri**  [ ] PRO SE
DuPage Attorney Number: **13900**
Attorney for: **First Trust Advisors L.P.**
Address: **111 West Monroe Street**
City/State/Zip: **Chicago, Illinois 60603**
Telephone Number: **(312) 845-3000**

**CHRIS KACHIROUBAS,** Clerk of the Eighteenth Judicial Circuit Court, and the seal thereof, Wheaton, Illinois

**Electronically Issued**
Date 11/13/2017

CHRIS KACHIROUBAS, Clerk

By KUFER, JAMES
Deputy Clerk

NOTE:  4156952
The filing of an appearance or answer with the Circuit Court Clerk requires a statutory filing fee, payable at the time of filing.

If you need legal advice concerning your legal responsibility as a result of this summons being serviced upon you and you don't have a lawyer, you can call the DuPage Bar Association, Lawyer Referral Service at 630-653-9109.

**CHRIS KACHIROUBAS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT ©**
**WHEATON, ILLINOIS 60187-0707**

Document received on 11/13/17 2:58 PM  Document accepted on 11/14/2017 11:59:26 # 4156952/17043858303

SUMMONS - CIRCUIT COURT                                                                 3101-**2** (Rev. 03/2011)

## SHERIFF'S FEES

Service and return .................................................................... $ _____

Miles _____ .............................................................. $ _____

**Total** ................................................................................................... $ _____

Sheriff of _____ County

## SHERIFF'S RETURN

I certify that I served this summons on defendant as follows:

☐    (a)    (Individual - **personal**):
                By leaving a copy and a copy of the complaint with each individual as follows:

☐    (b)    (Individual - **abode**):
                By leaving a copy and a copy of the complaint at the usual place of abode of each individual with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons, and also by sending a copy of the summons and the complaint in a sealed envelope with postage fully prepaid, addressed to each individual at the usual place of abode, as follows:

☐    (c)    (Corporation):
                By leaving a copy and a copy of the complaint with the registered agent, officer, or agent of each corporation as follows:

☐    (d)    (Other service):

☐    (e)    (Unable to Serve):
                By _____ ,    Deputy Badge Number: _____

---

Name of Defendant _____         Name of Defendant _____

Name of Person summons given to _____         Name of Person summons given to _____

Sex _____ Race _____ Approx. age _____         Sex _____ Race _____ Approx. age _____

Place of service _____         Place of service _____

City, State _____         City, State _____

Date of service _____ Time _____         Date of service _____ Time _____

Date of Mailing _____         Date of Mailing _____

                                                                        Sheriff of _____ County

Special Process Server of _____         County Illinois License # _____

                                                                        By _____

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

| | |
|---|---|
| FIRST TRUST ADVISORS L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) 2017L001260 |
| VIRTU AMERICAS LLC, | ) |
| | ) |
| Defendant. | ) |

Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
********* DuPage County *********
TRAN# : 17043858303/( 4156952 )
2017L001260
FILEDATE : 11/13/2017
Date Submitted : 11/13/2017 02:58 PM
Date Accepted : 11/14/2017 11:58 AM
KUFER,JAMES
2-13-2018 RM2020 9AM
**********************

## COMPLAINT

Plaintiff, FIRST TRUST ADVISORS L.P. (*"FTA"*), by and through its attorneys, Chapman and Cutler LLP, and for its Complaint against defendant VIRTU AMERICAS LLC (*"Virtu"*), respectfully alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. FTA is an Illinois limited partnership with its principal place of business located at 120 E. Liberty Drive, Suite 400, Wheaton, Illinois 60187. FTA is a registered investment adviser providing, *inter alia*, investment advisory services to registered investment companies and institutional investors.

2. Virtu is a Delaware limited liability company with its principal place of business located at 300 Vesey Street, New York, New York 10282. Virtu is a registered broker-dealer with the Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority (*"FINRA"*), and is in the business of, *inter alia*, executing buy and sell orders for its customers, operating as a market maker in various asset classes, providing institutional sales and trading services in equities and exchange traded products, providing market access and trading algorithms, and operating two alternative trading systems: Virtu BondPoint and Virtu Matchit.

3. This Court may properly exercise jurisdiction over defendant Virtu because Virtu is subject to personal jurisdiction in DuPage County, Illinois pursuant to 735 ILCS 5/2-209(a)(1) and (7) by having transacted business with FTA and FTA's predecessors-in-interest in DuPage County, Illinois, and by virtue of the making and/or substantial performance of a contract and other promises that are substantially connected with DuPage County, Illinois. Jurisdiction is also properly exercised by this Court against Virtu pursuant to 735 ILCS 5/2-209(c) by virtue of Virtu conducting business on a systematic and continuous basis in the State of Illinois.

4. Venue is proper in DuPage County, Illinois because the claims which form the basis of this Complaint occurred in material part in DuPage County, Illinois.

## BACKGROUND FACTS

5. FTA's predecessors-in-interest are four exchange-traded funds (*"ETFs"*), three established in the United States, and the fourth of which is a sub-fund of First Trust Global Funds plc (the *"Company"*), an Irish UCITS established as an investment company with variable capital and an umbrella fund with segregated liability between its sub-funds. They are (i) First Trust Small Cap Core AlphaDEX® Fund (*"FYX"*), (ii) First Trust Small Cap Growth AlphaDEX® Fund (*"FYC"*), (iii) First Trust Small Cap Value AlphaDEX® Fund (*"FYT"*), and (iv) First Trust US Small Cap Core AlphaDEX® UCITS ETF (*"FYXLN"* and together with FYX, FYC, and FYT, the *"Funds"*).

6. FTA is the investment advisor to each Fund established in the United States and the investment manager of the Company, and is charged with managing the investments of each Fund in accordance with the Funds' investment objectives as described in the prospectus for each Fund. The management responsibilities include the determination of which securities will be purchased, retained or sold by each Fund and the selection of broker-dealers to execute the trades.

7. ETFs are marketable securities that seek to provide investment returns that often correspond to the performance of a specific index consisting of equity and/or fixed income securities.

8. ETFs trade similarly to stocks and are listed on an exchange. The United States ETFs list and principally trade their shares on the NASDAQ stock exchange.

9. ETF shares consist of fractional interests in the ETF, which are made up of a portfolio of securities that the ETF owns. Thus, ETFs allow investors to have investments that are tied to certain securities without the investor having to purchase and own any underlying security directly.

10. The value of an ETF is calculated by and presented to the investing public as its net asset value (*"NAV"*), which reflects the closing market prices of the underlying securities held by the ETF on each day of valuation.

11. FYX and FYXLN are ETFs which seek to provide results that correspond to the performance of the NASDAQ AlphaDEX® Small Cap Core Index. Similarly, FYC seeks to provide results that correspond to the performance of the NASDAQ AlphaDEX® Small Cap Growth Index, and FYT seeks to provide results that correspond to the performance of the NASDAQ AlphaDEX® Small Cap Value Index.

12. The investment objectives of index-based ETFs such as FYX, FYXLN, FYC and FYT are to provide investment results tracking, as close as possible, to the price and yield of the corresponding index, with these investment objectives serving as the primary basis by which such index-based ETFs are marketed to the investing public. Accordingly, the ability of such index-based ETFs to continually balance its securities holdings to track the corresponding index is of paramount importance.

13. To track the performance of corresponding indexes as closely as possible to meet their investment objectives, index-based ETFs must weight their securities holdings in similar fashion to that of the indexes, and they do so by periodically buying, holding and selling securities in such a manner as to replicate the underlying indexes on which the ETFs are based. This management includes what is commonly referred to as "rebalancing" and "reconstituting".

14. Rebalancing is the process of realigning the weightings of a Fund's portfolio of securities as a result of changes in the underlying index. Reconstituting is the process of adding and removing securities and re-ranking existing securities in a Fund's portfolio to match the applicable index. ETFs rebalance and reconstitute periodically, often on a quarterly, semi-annual or annual basis, or even more frequently depending on the frequency of index changes. In this case, rebalancing and reconstituting involve the Funds periodically buying or selling securities in a Fund's portfolio through one or more executing broker-dealers to maintain an original desired level of asset allocation to track the index.

15. This process of rebalancing and reconstituting served and continues to serve to keep the Funds in line with their respective indexes identified in paragraph 11 above. In this instance, each of the Funds have been, and currently are, rebalanced and reconstituted quarterly during the calendar year.

16. To implement this quarterly rebalancing and reconstituting on behalf of the Funds, FTA has utilized Virtu since March 2013 (along with others) as an executing broker-dealer to buy and sell securities for the Funds. Virtu holds itself out as having significant and long-standing experience in all aspects of executing trades on behalf of ETFs and investment advisers in both the United States and Europe, utilizing proprietary technology and experienced traders in the rebalancing of ETF portfolios by trading on the major U.S. stock exchanges and markets, including the NYSE and NASDAQ.

17. Throughout their trading relationship, Virtu and FTA agreed that, in exchange for commission payments, Virtu would, on FTA's instructions, timely execute trades to buy or sell particular securities for the Funds in compliance with such instructions from FTA. These instructions are provided through the Bloomberg EMSX system ("*Bloomberg System*"), a multi-asset class trading platform that integrates exchange and broker data with a customer's orders. The Bloomberg System also allows customers, such as the Funds, to route orders to any of the participating broker-dealers, such as Virtu.

18. From the beginning of this trading relationship between Virtu and FTA (on behalf of one or more of the Funds), starting in March 2013 and through October 5, 2017, in every instance where FTA placed orders to be executed by Virtu on behalf of the Funds, Virtu executed the orders in accordance with their terms and accordingly earned its commission as agreed.

19. With respect to Virtu's specific involvement in the periodic rebalancing and reconstituting of the Funds' portfolios, FTA requested that trades be executed by Virtu according to specific written instructions or orders. One type of written order that FTA commonly used in connection with Virtu in the rebalancing of the Funds' portfolios is a written instruction called "market on close" ("*MOC Order*").

20. A MOC Order means that a customer instructs the executing broker-dealer to buy or sell a given security at the closing price in the appropriate market at the end of the trading day on which the MOC Order was placed.

21. By various exchange rules, MOC Orders must be electronically entered by the executing broker by either 3:45 p.m. EST (for the NYSE), or 3:50 p.m. EST (for NASDAQ), as the market closes at 4:00 p.m. EST.

22. On all occasions prior to October 6, 2017, Virtu had properly executed the MOC Orders delivered to Virtu by FTA at the closing prices on the trading day on which the MOC Order was placed, was aware of the exchange rules regarding trades with MOC Orders, including NYSE and NASDAQ rules and, upon information and belief, has written policies and procedures regarding the execution of customer trades with MOC Orders.

23. For example, on July 10, 2017, Virtu accepted MOC Orders timely delivered from FTA on behalf of each of the Funds and executed all of the trades with MOC Orders at the end of the trading day, as required by the MOC Orders, and earned a commission as agreed between the parties.

24. On the morning of Friday, October 6, 2017 FTA, on behalf of the Funds, and in conformance with its prior trading practices and procedures with Virtu, submitted written MOC Orders for four "baskets" of trades involving purchases and sales of securities for the Funds (the *"MOC Trades"*). The MOC Trades were acknowledged by Virtu in writing shortly thereafter.

25. Early in the afternoon on October 6, 2017, following submission of the MOC Trades and acknowledgment of the MOC Trades by Virtu, but prior to market close, John Capuano ("*Capuano*") of Virtu contacted Lance Hinkle ("*Hinkle*") of FTA by telephone to ask if any of the MOC Trades should be executed prior to the close of the market due to liquidity concerns. Hinkle informed Capuano that all trades were to be executed at the market close.

26. However, after the market closed on October 6, 2017, Capuano contacted Hinkle again by telephone and advised of Virtu's failure to execute the MOC Trades.

27. In that discussion, Capuano informed Hinkle that, due to "technical issues," the MOC Trades had not been executed. Hinkle was further told by Capuano that there was a "software glitch" in the Virtu trading system, and further explained that while the MOC Trades had been queued in Virtu's software system, Virtu had been running a hypothetical closing

auction within their systems (the *"Software Test"*). However, according to Capuano, when the Software Test was over, Virtu, in cancelling all closing auction orders for the Software Test, erroneously cancelled the MOC Trades accepted by Virtu earlier in the day.

28. Virtu's failure to execute the MOC Trades was therefore due to Virtu's actions and not due to any trading halt, or other conditions beyond Virtu's control.

29. Acknowledging its failure to execute the MOC Trades in compliance with the MOC Orders, Capuano unambiguously promised Hinkle during the afternoon conversation on October 6, 2017 that Virtu would make the Funds whole for any damages caused by the failure to complete the MOC Trades at the market prices existing at the close on October 6, 2017, as required by the MOC Orders and as accepted by Virtu.

30. Capuano then informed Hinkle during this same conversation that Virtu would complete the MOC Trades once the markets opened on Monday, October 9, 2017, to which Hinkle had no reaction other than to reiterate that Virtu needed to make the Funds whole for the failure to comply with the MOC Orders and complete the MOC Trades in a timely manner on October 6, 2017.

31. Because of Virtu's representation to make the Funds whole for any losses suffered by Virtu's failure to execute the MOC Trades on October 6, 2017, FTA did not take any further action to mitigate any potential losses.

32. Throughout the day on October 9, 2017, the MOC Trades were eventually completed by Virtu, some during market hours and others at close.

33. However, the MOC Trades that were eventually completed on October 9, 2017 were not executed at the October 6, 2017 closing prices, but rather at prices other than those existing as of the close of the market on October 6, 2017.

34.     Thus, Virtu's failure to execute the MOC Trades on October 6, 2017 as instructed and agreed to by Virtu directly caused the Funds to suffer significant losses.

35.     Specifically, due to Virtu's failure to execute the MOC Trades on October 6, 2017, as agreed with FTA, FYX lost $3,456,677.90 of its NAV (on a total trading volume of $371,794,568.00), FYC lost $1,053,250.77 of its NAV (on a total trading volume of $136,736,964.10), FYT lost $519,907.13 of its NAV (on a total trading volume of $58,232,319.78), and FYXLN lost $13,647.85 of its NAV (on a total trading volume of $1,752,469.59) in each case, the difference between the closing prices on October 6, 2017 and the prices at which the trades were executed on October 9, 2017.

36.     While the MOC Trades were in the process of completion on October 9, 2017, Capuano of Virtu, in a telephone conversation with Hinkle of FTA, again unambiguously assured FTA that Virtu would "make the Funds whole" for the damages suffered by the Funds as a result of Virtu's failure to execute the MOC Trades on October 6, 2017.

37.     Later on October 9, 2017, in another telephone call between Hinkle and Stan Ueland (*"Ueland"*) of FTA, and Capuano of Virtu, along with Joseph Molluso (*"Molluso"*), Virtu's CFO, and Stephen Cavoli (*"Cavoli"*), a senior sales person at Virtu, Virtu again represented that Virtu would make the Funds whole for Virtu's trading error, and further offered to pay an initial $1,000,000 immediately, with an offer to provide commission-free trading to the Funds and FTA until the Funds were made whole. Hinkle and Ueland immediately rejected that offer and, in yet another later call on October 9, 2017, Hinkle, Ueland and Dan Lindquist (*"Lindquist"*), a Managing Director at FTA, again informed Molluso that Virtu needed to make the Funds whole as promised by the close of business on October 11, 2017, the settlement date for the MOC Trades if they had been properly executed on October 6, 2017.

38. On October 10, 2017, during a morning telephone conversation between Molluso of Virtu and Hinkle and others at FTA, Virtu was again informed that Virtu needed to make the Funds whole by the close of business on October 11, 2017. Later in the day on October 10, 2017, and to reiterate that demand, counsel for the Funds sent a letter to Virtu confirming these conversations and reaffirming the requirement that Virtu make the Funds whole by October 11, 2017.

39. To date, however, Virtu has failed to make the Funds whole for the damages caused by its failure to carry out the MOC Trades in a timely manner on October 6, 2017.

40. After the Funds suffered the aforementioned losses in its NAVs, FTA compensated the Funds in full for their losses in exchange for the Funds assigning to FTA all of the Funds' claims against Virtu for failing to comply with the MOC Trades on October 6, 2017.

41. As a result of the assignment of these claims, FTA, the investment manager to the Funds, now stands in the shoes of the Funds as the owner of the instant causes of action.

## COUNT I – BREACH OF CONTRACT

42. FTA realleges and incorporates by reference Paragraphs 1 – 41 above as Paragraphs 1 – 41 of Count I.

43. Based on the MOC Orders transmitted by FTA on behalf of the Funds to Virtu, together with the conduct of the parties as reflected by previous submission of MOC Orders by FTA to Virtu, Virtu understood and agreed that upon FTA's delivery of the MOC Orders on October 6, 2017 before the deadline set by the relevant exchange, Virtu would execute the MOC Trades before the close of markets on October 6, 2017.

44. FTA satisfied all requirements of its long-standing agreement and understanding with Virtu by placing the MOC Orders with Virtu before 3:45 p.m. and 3:50 p.m. EST, the NYSE and NASDAQ deadlines.

45. However, and despite Virtu's acknowledgment of the MOC Orders and agreement to make the MOC Trades as instructed, Virtu failed to to execute the MOC Trades at the close of the market on October 6, 2017.

46. After Virtu's failure to execute the MOC Trades as agreed, Virtu further acknowledged its breach and unambiguously agreed to make the Funds whole for any losses the Funds may suffer as a result of that breach.

47. However, to date, Virtu has failed to compensate the Funds or FTA for the Funds' losses.

48. Virtu's breach of its agreement with FTA on behalf of the Funds directly harmed the Funds, as FYX lost $3,456,677.90 of its NAV, FYC lost $1,053,250.77 of its NAV, FYT lost $519,907.13 of its NAV, and FYXLN lost $13,647.85 of its NAV, for a total loss of $5,043.483.65 of the Funds' NAV.

49. The Funds, and FTA on behalf of the Funds, have performed all of their respective duties and obligations in relation to the agreement with Virtu, and have been damaged as a result of the breach of the agreement by Virtu, as alleged above.

**WHEREFORE**, Plaintiff First Trust Advisors L.P. respectfully requests that this Court enter judgment in its favor and against Defendant Virtu Americas LLC on Count I of this Complaint in the amount of $5,043.483.65, as well as its costs and attorneys' fees, and any other relief that this Court deems just and proper.

<u>COUNT II – PROMISSORY ESTOPPEL</u>

50. FTA realleges and incorporates by reference Paragraphs 1 – 49 above as Paragraphs 1 – 49 of Count I.

51. In the alternative, Virtu's unambiguous representations and promises on October 6 and October 9, 2017 to make the Funds whole for any losses the Funds may suffer as a

- 11 -

result of Virtu's failure to timely execute the MOC Trades on October 6, 2017 constitutes promissory estoppel.

52. Virtu's representations and promises were unambiguous, and were made on numerous occasions thereafter on October 6, 2017 and October 9, 2017.

53. FTA, on behalf of the Funds, accepted and relied on Virtu's representations and promises on those dates, and its reliance was expected and foreseeable by Virtu, as Virtu and FTA are experienced in the securities industry and understood both what Virtu's failure to timely execute the MOC Trades, and Virtu's promise to make the Funds whole, meant to the Funds.

54. The Funds relied on Virtu's representations and promises to its detriment. Among other things, FTA did not take any actions to mitigate any potential losses to the Funds.

55. The Funds were damaged by Virtu's breach of its representations and promises to make the Funds whole, and is entitled to damages as a result.

**WHEREFORE**, Plaintiff First Trust Advisors L.P. respectfully requests that this Court enter judgment in its favor and against Virtu Americas LLC on Count II of the Complaint in the amount of $5,043.483.65, as well as its costs and attorneys' fees, and any other relief that this Court deems just and proper.

    Respectfully submitted,

    FIRST TRUST ADVISORS L.P.

    By _____
           One of Its Attorneys

David T.B. Audley
Joseph P. Lombardo
Sara T. Ghadiri
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603-4080
(312) 845-3000
(312) 701-2361 (Fax)

- 11 -

Request received from IP 173.72.158.71 MD 5sum match applied on 11/16/2020 at 01:15:59 12:46 49949527 0483 5878 103

AFFIDAVIT OF DAMAGES 2348 (Rev. 03/07)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA<br>IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | COUNTY OF DU PAGE |

First Trust Advisors L.P.

vs

Virtu Americas LLC

2017L001260

CASE NUMBER

*File Stamp:*
Chris Kachiroubas
e-filed in the 18th Judicial Circuit Court
********* DuPage County *********
TRAN# : 17043858303/( 4156952 )
2017L001260
FILEDATE : 11/13/2017
Date Submitted : 11/13/2017 02:58 PM
Date Accepted : 11/14/2017 11:58 AM
KUFER,JAMES

File Stamp Here

# AFFIDAVIT OF DAMAGES

### SUPREME COURT RULE 222

The undersigned being first duly sworn upon oath, deposes and states that he / she is a party to the above entitled cause of action seeking money damages or collection of taxes and states that this cause of action

☐ does **not** exceed $50,000.00         ☒ does exceed $50,000.00

Sworn and Subscribed before me

November 13, 2017
Date

*[signature]* Nancy A. Zarazua
Notary Public / Circuit Court Clerk

OFFICIAL SEAL
NANCY A. ZARAZUA
Notary Public - State of Illinois
My Commission Expires 5/24/2021

CHRIS KACHIROUBAS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60187-0707